[No. 22468. *En Banc.* December 1, 1930.]

VERN WILKINSON, *Appellant,* v. TACOMA TAXICAB & BAGGAGE TRANSFER COMPANY, *Respondent.*[1]

*Wm. H. Pratt,* for appellant.
*William R. Lee,* for respondent.

PARKER, J.—The plaintiff, Wilkinson, seeks recovery of damages for personal injuries which he claims to have suffered as the result of the negligence of his employer, the defendant transfer company, in that it negligently furnished him one of its taxicabs to drive, it not having a self-starter, while in an unsafe condition for cranking by hand. While he was cranking the motor, it back-fired, causing the crank to kick back and seriously injure his hand. The back-fire, as claimed by Wilkinson, was caused by the spark being too far advanced, it being set and permanently fixed in that position so that it was not changeable by the driver.

The cause proceeded to trial in the superior court for Pierce county, sitting with a jury, and resulted in a verdict awarding to Wilkinson recovery in the sum of five hundred dollars. Counsel for the transfer company, by appropriate motion before the rendering of

[1]Reported in 293 Pac. 455.

the verdict and thereafter by motion for judgment notwithstanding the verdict, challenged the sufficiency of the evidence to support any recovery against it. The latter motion was by the court sustained and judgment rendered accordingly in favor of the transfer company, from which Wilkinson has appealed to this court.

The only question here to be decided is as to whether or not the evidence supports any right of recovery in Wilkinson, more particularly the question of whether or not he assumed the risk of being injured in the manner he was injured should be decided against him as a matter of law. The controlling facts, as we read this record, viewed most favorably to Wilkinson, we think, may be fairly summarized as follows:

The transfer company, as a part of its business, operates a number of taxicabs in Tacoma. Wilkinson was employed as one of its cab drivers during and for sometime prior to March 8 and 9, 1929. During those days and sometime prior thereto, Wilkinson was driving the transfer company's cab No. 52. The cab was not equipped with a self-starter, and hence had to be started by cranking by hand. The control of the spark fixed the spark in a permanent and unchangeable position in so far as the driver was concerned; that is, he could not retard or advance the spark. That had to be done by adjustment by the mechanic in the company's shop. Thus Wilkinson was prevented from retarding the spark to make for greater safety from back-firing when he cranked the motor for starting. He was a very experienced driver of motor vehicles, including cabs, and equally experienced in starting motors of such vehicles by cranking by hand.

The transfer company maintained a shop for the keeping of its cabs in proper mechanical condition, which shop was in charge of a skilled mechanic who did all such mechanical work. It was a rule of the transfer

company that, when a driver considered the cab he was driving to be in need of repair or mechanical attention, he should write on a slip of paper what was needed in that respect and place the slip in a place designated for that purpose, where the mechanic would get it and do whatever was needed to put the cab in proper mechanical condition. On the days in question and for some time prior thereto, it was the duty of Wilkinson to drive cab No. 52 during the hours from 7 a. m. to 5 p. m.. During the same time, it was the duty of another driver to drive cab No. 52 during the hours from 5 p. m. to 3 a. m.

During the day of March 8, the motor of cab No. 52 back-fired a number of times while being cranked by Wilkinson. He, however, was not injured on any such occasions. When Wilkinson turned the cab in at the end of his day's work at 5 p. m. on August 8, he wrote upon a slip, placed it as the rule required, and also orally told the mechanic, to "adjust the timer and fix the brakes," referring to cab No. 52. On the following morning, March 9, at 7 a. m., he returned to work, took the cab and drove it away without then seeing the mechanic or anyone else connected with the company. He then discovered that the brakes had been fixed, but that the timer had not been fixed. Upon cranking the motor the first time that morning, it back-fired, though he was not then injured thereby. He did not stop to see the mechanic. The mechanic had not yet come to work, it being customary for him to come to work between 7:30 and 8 o'clock a. m. Wilkinson received no directions of any nature at that time from anyone connected with the transfer company. He was injured while cranking the motor at about 11:45 that morning, while attempting to start it. Now let us hear Wilkinson's own story. He testified in part as follows:

"Q. State the condition of this cab No. 52 on March

8.  A.  I went to work at 7 o'clock and quit at 5.  I made a report and hung it up where we are supposed to hang them upon a clip, and also told the mechanic, Bill Taylor, to adjust the timer and fix the brakes.  On the 9th day of March I took the cab out and the crank kicked.  I started out at 7 o'clock in the morning and about 11:45 in the morning, at 9th and Pacific, I got a passenger and went around and started to crank the car, and when I pulled up on the crank, because I was afraid of it anyway, it snapped my hand.  Q.  What was the mechanism of those cars with regard to starters, did they have starters on them?  A.  No, they have not.  Q.  Was there any adjustment of the spark so you could retard it?  A.  No; that is, a set spark; we cannot touch that at all; all we use is the gas throttle.  That is the only way to start it.  It is already set.  We have to crank the car to start it.  Q.  The next day were the brakes or anything like that repaired?  A.  The brakes were fixed; the timer had not been touched.  Q.  About how many times a day would you need to crank this taxicab?  A.  That depends upon how many times we start. If we were in a hurry and had to go, we would leave the engine running, but as a rule it depends upon how many trips.  Some days we would have fifteen or eighteen trips.  Each trip we would have to start, and when we returned again we would shut the motor off, and if we got a load in the meantime we would not have to crank the car.  Q.  Then you cranked it all day on the 8th of March knowing that it was kicking.  A.  I had to crank it.  Most of the time I did not crank it.  I left the engine running.  Q.  Next morning when you started out it kicked, didn't it?  A.  Yes, sir, but I watched myself.  Q.  You went ahead with it that day knowing that it was kicking?  A.  Yes, sir, I left it running most of the time.  Q.  How many times did you crank it that morning?  A.  Not more than three or four times, because I had not had very many passengers.''

■ Wilkinson's own testimony thus renders it plain that he knew of the tendency of the motor to back-fire and thus render it dangerous to crank, when

he turned it in on the close of his day's work on March 8, and also knew that such condition had not been remedied upon his starting the motor the next morning. Had he made no report and taken the cab out the next morning and continued its operation, it seems plain that it would have to be decided as a matter of law that he would have assumed the risk of continuing the operation of the cab in its then condition. We see no escape from Wilkinson's being held as a matter of law to have assumed the risk of taking out and continuing the operation of the cab in its then condition, other than possibly upon the theory that he properly complained of its dangerous condition and received assurance from his employer that it would be made safe and a direction from his employer that he in the meantime should proceed with its operation in its then condition.

We have seen that Wilkinson's report to the mechanic touching the mechanical deficiencies of the cab was simply to "adjust the timer and fix the brakes"—nothing more. He did not report that the motor had a tendency to back-fire when being cranked, or that the motor was in a dangerous condition for cranking. His report did not indicate that the spark was too far advanced any more than that it was too far retarded. He did not indicate that he was unwilling to continue the driving of the cab in its then condition. We have also seen that there was no response made by the company to Wilkinson's report as to the mechanical needs of the car, other than the fixing of the brakes, nothing being done to the timer, nor was there any promise made to Wilkinson as to the adjustment of the timer, nor any direction to him to proceed with the use of the cab in its then condition. Indeed, he took it away on the morning of the 9th without opportunity on the part of his employer to make to him any such promise or

to give to him any such direction, he learning before he took the cab away that "the timer had not been touched."

There is invoked in behalf of Wilkinson the general rule that, where complaint is made by an employee to his employer of dangerous conditions of appliances or place to work, indicating his unwillingness to continue to work under such conditions, and the employer assures the employee that such conditions will be remedied and directs the employee to proceed with his work temporarily under such conditions, the employee does not ordinarily assume the risk of injury which may result to him from such conditions, as recognized by us to be the law in *Wickman v. Twin Harbor Stevedoring & Tug Co.*, 138 Wash. 153, 244 Pac. 268; *Lucas v. Luckenbach Steamship Co.*, 141 Wash. 504, 252 Pac. 526, and our earlier decisions. There is also invoked in behalf of Wilkinson the further general rule that the promise of the employer that a complaint of danger in appliances and place to work, and direction of the employer to the employee to proceed under existing conditions, need not be made in express terms in order to warrant the employee's proceeding under existing conditions, as was held in *Johnson v. North Coast Stevedoring Co.*, 109 Wash. 236, 186 Pac. 663.

We are of the opinion that neither of these general rules is controlling of the claimed rights here in question. It is plain by Wilkinson's own testimony that his report to the mechanic of the mechanical needs of the cab at the close of his day's work on March 8 did not mean that he was unwilling to continue to operate it, in so far as the timer adjustment was concerned, until such adjustment was made. Indeed, that need was not in his report mentioned as a dangerous condition; and besides, he took the cab out the next morning knowing the timer had not been adjusted, without

380

any promise or direction from his employer of any nature. *Tatum v. Marsh Mines Consolidated,* 108 Wash. 367, 184 Pac. 628, 187 Pac. 410.

We conclude, as the trial judge did, that it must be held as a matter of law that Wilkinson assumed the risk of being injured in the way he was injured, and that therefore the judgment denying him recovery must be affirmed. It is so ordered.

MITCHELL, C. J., MAIN, BEALS, TOLMAN, HOLCOMB, and MILLARD, JJ., concur.